IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT SILVA-PRENTICE and DIONISIO PAULINO,<br><br>                          Plaintiffs,<br><br>          -against-<br><br>THOMAS TURCO, et al.<br>                      Defendants. | Civil No. 1:21-cv-11580-PBS |

**DECLARATION OF BRIDGET A. ZERNER
IN SUPPORT OF PLAINTIFFS' THIRD MOTION TO COMPEL**

I, Bridget A. Zerner, declare under penalty of perjury as follows:

1.      I am counsel for Plaintiff Dionisio Paulino in this action. I make this declaration setting forth facts I know of my own personal knowledge as to which I am willing to testify if called upon to do so.

**Document Requests and Responses**

2.      Plaintiffs served their first set of document requests over a year and a half ago on June 13, 2022. A copy has already been filed on the record and can be found at Dkt. No. 112-1.

3.      Defendants served written responses to these written requests on August 4, 2022 and then supplemented their written response on August 19, 2022, August 30, 2022, August 31, 2022, and September 16, 2022. Defendants also served a letter response to issues raised with their responses to the first set of requests on March 31, 2023.  Defendants then served a supplemental response on July 7, 2023.  A copy of their final supplemental response is on the record at Dkt. No. 112-2.

4.     After various meet and confers on whether follow up requests for documents fell under the first set of requests, at the request of Defendants, Plaintiffs served a second set of document requests on February 8, 2023. A copy is on the record at Dkt. No. 112-3.

5.     On March 31, 2023, Defendants served their written response to Plaintiffs' Second Set of Document Requests. A copy is on the record at Dkt. No. 112-4.

**Document Production Deadlines and Motions to Compel**

6.     After several previous continuances of the discovery deadline, document production was to be completed by March 30, 2023 pursuant to the Court's Order (Dkt. No. 74) granting Defendants' unopposed motion (Dkt. No. 73).

7.     On March 9, 2023, this Court held a status conference and heard arguments on a motion concerning informant information at which Plaintiffs' counsel also raised concerns that Defendants would not complete their document production by the March 30th deadline in the coming weeks. After the status conference concluded, the Court issued the Clerk's Notes (Dkt. No. 87) on the conference stating again that all documents needed to be turned over by March 30, 2023 and ordering the parties to confer and submit a revised schedule by March 20, 2023 and include a potential mediation date.

8.     Counsel for the parties conferred and filed a joint revised schedule that included the March 30th document production deadline. (Dkt. No. 89) Defendants did not ask to change the date. The Revised Schedule was approved by the Court. (Dkt. No. 90, Order)

9.     Despite three separate orders setting the March 30th document production deadline, Defendants not only failed to complete their production but they failed to move the Court for an extension of their deadline forcing Plaintiffs' counsel to file a motion to compel.

### *First Motion to Compel – Dkt. No. 95*

10.     On April 12, 2023 (at Dkt. No. 95), Plaintiffs filed their first motion to compel seeking to compel Defendants' compliance with the Court's scheduling order deadline. Defendants opposed the motion (Dkt. No. 100).

11.     On June 6, 2023, Magistrate Judge Dein allowed the Plaintiffs' motion to compel in part ordering "Defendants shall complete their document production by September 1, 2023," ordering that depositions were to be completed 60 days after Defendants' completed their document production, and ordering the parties to further meet and confer in an effort to reach agreement regarding ways in which to limit the scope of the Defendants' search for documents responsive to Plaintiffs' requests, including how emails should be searched. Dkt. No. 106, Order. The Order also provided that "If necessary, any further motion to compel regarding the defendants' document production shall be filed by June 23, 2023." *Id.*

### *Second Motion to Compel – Dkt. No. 108*

12.     After additional meet and confers between counsel as ordered, the parties could not resolve all their disputes. Plaintiffs then filed their second motion to compel (Dkt. No. 108) against Defendants concerning the following categories about which the parties were unable to reach agreement: (1) lost/missing/destroyed evidence; (2) documents related to the DOC's Disorder and Special Operations policies involved in this dispute; (3) questioning of defendants at their depositions about their roles in document production; (4) disciplinary files of Defendants; (5) salary/overtime records of Defendants; (6) email production by Defendants; (7) questioning of Defendants about a grand jury investigation; and (8) production of daily management reports from January 2020.

13.     A motion hearing was held before Magistrate Judge Dein on August 1, 2023. A

true and accurate copy of the transcript of the motion hearing is attached as **Exhibit A**.

14.     Thereafter, on August 1, 20203, Magistrate Judge Dein issued an order on

Plaintiffs' motion to compel (Dkt. No.  118) ruling as follows (attached as **Exhibit B**):

> The plaintiff's motion to compel is ALLOWED IN PART and DENIED IN
> PART as follows:
>
> (a) The plaintiffs may serve interrogatories requesting information regarding the
>     existence of specific documents that are responsive to the plaintiffs' requests
>     for the production of documents but have not been produced. Alternatively,
>     the plaintiffs may serve additional document requests seeking the production
>     of the specific documents.
>
> (b) The plaintiffs may serve an additional interrogatory regarding the existence
>     and location of any videos showing the extraction of Prisoner 2 from a cell.
>
> (c) As agreed, the defendants shall search for and produce, to the extent it exists,
>     a copy of the document entitled "HQ Reaction Plans per 103 DOC 560,
>     Disorder Management." The plaintiffs' motion to compel the production of
>     documents created or maintained pursuant to the disorder and Special
>     Operations Division policies is otherwise DENIED based on the defendants'
>     representation that they have searched for and produced all such documents.
>
> (d) The defendants shall produce information from their disciplinary files that
>     describes the substance of any alleged incidents involving prisoners directly,
>     including any alleged failure to intervene in such incidents, that occurred
>     within the 5 years prior to the incident at issue in the present litigation. The
>     information shall include, but shall not be limited to, details regarding the
>     defendant's alleged infraction(s) and any resulting discipline. To the extent it
>     is available, the information shall also include any reports of disciplinary
>     hearings before the IAD and the Commissioner, and any disciplinary
>     decisions that were made by the Commissioner.
>
> (e) The defendants shall produce executive summaries from any IAD
>     investigations of Raymond Turcotte and Charles Primack during the time
>     period from 2016 to the present.
>
> (f) During depositions, the plaintiffs are entitled to ask the witnesses whether
>     they searched for documents responsive to the plaintiffs' requests for
>     documents and what documents they were seeking, but may not inquire into
>     privileged communications.

(g) The plaintiffs' motion to compel the production of documents regarding the defendants' salaries, overtime and benefits is DENIED WITHOUT PREJUDICE to renewal, if appropriate, at a later stage in the proceedings.

(h) The defendants shall search the emails of the current defendants and Joe Freitas, and produce responsive emails for the time period from January 10, 2020 through November 9, 2020.

(i) The plaintiffs' motion to compel witnesses to answer deposition questions pertaining to the federal grand jury is DENIED.

(j) The defendants shall produce daily management reports for the time period from January 10, 2020 through January 19, 2020.

15.     With respect to paragraph (h) of the Court's Order ordering defendants to search the emails "of the current defendants and Joe Freitas," the current defendants are the following 22 individuals (Plaintiffs dismissed 10 defendants on April 12, 2023): Turco, Mici, Fallon, Henderson, Primack, Kenneway, Ferreira, DePalo, Gray, Shaw, Allain, Lanpher, McCulloch, Breslin, D'Amadio, Murphy, O'Reilly,  Turcotte, Laranjo, Marchand, Thomas, and Mulvey.

16.     Defendants requested an extension of their document production deadline at the hearing and were advised to file a motion to amend the scheduling order.

17.     On August 25, 2023, Defendants moved to enlarge the discovery deadline proposing a new deadline for document production only (Dkt. No. 119). Plaintiffs responded by proposing specific dates for all the remaining deadlines, including the time to complete depositions (Dkt. No. 120).

18.     On September 5, 2023, this Court issued an Order (Dkt. No. 121) allowing the motion to extend and ordering "All discovery deadlines extended for 60 days."

19.     The Defendants' deadline to complete document production was extended from September 1, 2023 to October 27, 2023. (Dkt. No. 121, with circling of October 27 date)

*The Third Motion to Compel – the Instant Motion*

20.     Defendants made the following productions on the following dates in response to the Court's Order:

| | |
|---|---|
| August 17, 2023 | • "Kenneway Emails – Batch 1 (pp. 1-1284)" |
| September 1, 2023 | • Certain documents concerning disciplinary issues for five of the defendants (D'Amadio, Marchand, O'Reilly, Primack, Turcotte)<br>• Daily Management Briefings from SBCC |
| September 13, 2023 | • HQ SOP Emergency Plan<br>• Disciplinary letter concerning Primack (that had already been produced on 9/1/2023) |
| September 15, 2023 | • "Henderson Emails – Batch 1 (pp. 1-79)"<br>• "Kenneway Emails – Batch 2 (pp. 1285-2742)" |
| September 22, 2023 | • "Kenneway Emails Batch 3 (pp. 2743-4170)" |
| October 12, 2023 | • "Henderson Emails (pp. 80-609)" |
| October 27, 2023 | • "Depalo Emails"<br>• "Ferreira Emails"<br>• "Gray Emails"<br>• "Kenneway Emails"<br>• "Mici Emails"<br>• "Turcotte Emails"<br>• "Misc Emails – Jan-Nov. 2020" |
| November 3, 2023 | • "Gray Emails" |

The quotations used in the list above indicate the name of the PDF file produced by Defendants as named by them.

21.     All the email productions listed above are for the time period of January 10, 2020 to April 30, 2020 and do not include the extended time period through November 2020 as ordered by the Court on August 1, 2023 except for one – the pdf labeled "Misc Emails – Jan-Nov. 2020."

22. On September 6, 2023, we (Patty DeJuneas and I on behalf of Plaintiffs) followed up with defense counsel raising issues with their production to that point including specifying redactions that appeared to be inappropriate. We asked for the redactions to be removed or an explanation for them. We sent follow-up emails on these issues and to date have not been provided an explanation of the redactions challenged. Attached as **Exhibit C** is a true and accurate copy of the email correspondence.

23. On October 12, 2023, we emailed defense counsel about the status of document production. Their deadline to finish document production was less than a month away and we were concerned that they would not finish their production and wanted to plan accordingly with respect to scheduling depositions. Also, over a month had passed and no one had responded to our very specific redaction questions from our September 6, 2023 emails. We also raised that defense counsel had failed to respond to other missing document issues and challenged redactions raised in emails months earlier that went ignored. Attached as **Exhibit D** is a true and accurate copy of our October 12 email and the correspondence in response thereafter.

24. Almost a week later, we received a response email that only stated "Thanks for letting us know about the missing materials. We are working on getting them." (Exhibit D-6 to D-7) and did not address any of our other specific questions. We followed up on October 18 and October 24 and did not receive any response. (Exhibit D-5 to D-6). We then formally requested a meet and confer call which was scheduled for November 1, 2023. (Exhibit D-4 to D-5)

25. After the production of emails was served by Defendants on the Friday evening of October 27, 2023 (the deadline), we were certain that the production could not be complete based on what the Court had ordered. On October 31, 2023, I emailed asking if there would be another production coming and defense counsel advised no additional productions were coming

that day. (Exhibit D-2 to D-3) I then asked "Are you contending that your email production is complete and that you have fully complied with Judge Dein's order apart from the questions we raised in our prior emails?" (Exhibit D-2) Attorney Courtney Colonese for defendants responded "Let me verify with our discovery team and get back to you." (Exhibit D-1 to D-2) After a few hours passed, I emailed defense counsel advising that their document production was not complete based on what the court ordered and we would address why they had not completed their production at the meet and confer already scheduled for the next day. (Exhibit D-1)

### *Meet and Confer*

26.     Patty DeJuneas and I conferred telephonically with Courtney Colonese, Brad Sultan and Judith Elliott (DOC Paralegal) on November 1, 2023, for 25 minutes.

27.     During the call, defense counsel took the following positions:

(a) **Emails:** They had completed the email production obligation as of that time (with the exception of Defendant Gray emails due to a technical error that would be corrected so that we would receive Gray emails through April 2020). Defense counsel contended that we had reached an agreement that email production after April 2020 only required a much more limited range of search terms than the earlier time period. No such agreement, however, had been made. Further, neither Attorney Sultan nor Attorney Colonese could specify the search terms used or the custodians searched on the call and agreed to provide that information by the end of the same week.

(b) **Disciplinary Records Related to Defendant Turcotte:** In response to Judge Dein's order to produce executive summaries, Defendants produced an "Executive Review and Comments" and a letter from Defendant Commissioner Mici to Turcotte advising of a hearing held on whether Turcotte violated regulations and if so, the appropriate

discipline. The Mici letter references and relies on "the evidence presented at the hearing" as well as the "Hearing Officer's Report" concerning Turcotte. Plaintiffs requested that these documents be produced as well and defense counsel advised that Plaintiffs are not entitled to those documents because Judge Dein's order does not state that those must be produced and so they would not be produced.

(c) **Challenged Redactions:** Attorney Colonese first stated that they had "started" working on the process of obtaining the original unredacted documents to review but they were "not done" and began repeating how their DOC paralegals were working many hours a day to get the document production finished and that was the priority over addressing redactions. We pointed out that the attorneys, not the paralegals, should be addressing redaction challenges and when I asked specifically when they started that process as redaction questions were raised over a month ago, Attorney Colonese's response was: "that's not a relevant question" and "we don't have a redaction review deadline."

(d) **Text Messages**: We advised that the most recent email production (on the cutoff date of October 27) established that at least some defendants were texting about the incidents involved in this case, including texting about how they were drafting the incident reports related to Plaintiffs Silva-Prentice and Paulino, specifically. During prior meet and confers long ago on text messages, defense counsel took different positions from objecting to producing text messages to stating that the defendants did not use their phones at the facilities or did not text about these matters and ultimately no text messages were searched for (to our understanding) and certainly none have been produced. In light of the brand-new emails as well as recently produced

disciplinary records concerning Defendant Turcotte that state DOC did a forensic analysis of Turcotte's DOC cellular phone, we asked defense counsel to search for texts and produce them. Attorney Colonese responded: "you're not getting those, we object." We asked for the basis of the objection and she responded: "you'll have to make a motion and then we'll respond." She then went on to say that we discussed this repeatedly in the past indicating that we could not raise this again now. She then said: "go to the service provider." I asked if we went to the provider, would they then object to a subpoena served on the provider and Attorney Colonese said "we might" and also stated "we don't believe we owe you texts." Neither Attorney Colonese nor Attorney Sultan denied that they had earlier agreed to speak to their clients about their text messages. Defense counsel ultimately agreed to consider the new emails we had brought to their attention – i.e., the text messages about the Silva-Prentice and Paulino incident reports -- to see if they would change their position. They agreed to consider new emails about use of personal emails as well.

(e) **Missing Internal Affairs Interview Recordings:** At first Attorney Colonese stated that she confirmed with her client that there was no interview of the prisoner involved in this request. We told her it was our understanding that there was an interview. In response, Attorney Colonese changed positions and stated she would have to confirm whether there was just not a recording of the interview, rather than it never occurred and would be back to us.

(f) **Blank Pages / Missing Attachments:** Attorney Colonese advised their paralegal was working on addressing those technological errors and would be making a supplemental production.

(g) **Freitas Interview Recording:** We had emailed counsel that we were missing a recording of an Internal Affairs interview of Joseph Freitas (a now-dismissed defendant). Before our telephonic meet-and-confer, we emailed that this was no longer an issue to be addressed (because we had located the interview recording). Yet, Attorney Colonese went down her list of items for our discussion and first stated to us there is "no interview." She then corrected herself and stated there was an interview done before but not another one to produce.

(h) While paragraphs (e) and (g) are not discovery disputes to be decided, we include these details because they are part of a pattern of inaccurate representations by counsel about what discovery exists and what searches have been conducted. Defense counsel has repeatedly made unequivocal representations about discovery matters only to change their position when we catch the inaccuracy which is significant to the disputes before this Court described further herein.

28.     After our phone call on November 1, 2023, I sent a follow-up email to defense counsel that included attachments that showed examples of recently produced emails wherein certain defendants referenced texting each other and communicating outside of their DOC email accounts. We also further explained our request for additional disciplinary record information. Attached as **Exhibit E** is a true and accurate copy of that email with the attachments from Defendants document production.

**Email Production**

29.     On November 3, 2023, defense counsel emailed the list of the custodian accounts and the limited search terms they used to search emails from April 2020 to November 2020 as they agreed to do on our call. (Exhibit F-32 to F-34) The search terms were limited to each

plaintiff's name and each plaintiff's W number as well as a second search that included four other prisoner's names and W numbers. (DOC had alleged back in 2020 that these four other prisoners were involved with Plaintiff Paulino in planning attacks on correctional officers – an allegation we contend was false and contrived as part of the conspiracy of retaliation and a pretense to try to justify the beating of Paulino and Silva-Prentice after the fact.)

30.     On November 6, 2023, we emailed defense counsel stating that their limited search terms failed to comply with the Court's Order and the search of emails discussed during the hearing. Defendants' newer productions were based on very limited search terms that they had proposed to use prior to Plaintiffs' second motion to compel and which Plaintiffs had rejected, thus requiring Plaintiffs to file their second motion to compel which sought, inter alia, emails. We directed defense counsel's attention to the statements made at the motion hearing and to this Court's order, which did not authorize Defendants to use a more narrow set of search terms.

31.     During the August 1 hearing on Plaintiffs' second motion to compel,  when Judge Dein ruled that the Plaintiffs were entitled to emails through November 9, 2020, and not only through April 30, 2020, which Defendants had previously unilaterally chose as the cutoff, Attorney Brad Sultan specifically represented that they would be searching the later time period with the same search terms they had been using before – to which Plaintiffs had already agreed -- and not the much more narrowed set of search terms they later chose to use:

> MR. SULTAN:  . . . We believe that what Your Honor just said, November 9th, 2020, for the existing defendants, with those search terms, **many search terms which we've worked out with them**.
>
> THE COURT: And Mr. Freitas.
>
> MR. SULTAN: I'm sorry, Your Honor?

THE COURT: And you're going to add Mr. Freitas's email to that.

MR. SULTAN: We'll add Mr. Freitas to that, through November 9th, 2020. **And they're aware of the search terms because we discussed it with them. That includes "K-Nine" spelled out, K nine, dog, bites, everything**.

THE COURT: All right. I think that's sufficient.

(Exhibit A-37 to A-38) (emphasis added).

32.     The discussion went on as Attorney DeJuneas sought to inquire about a key date which defense counsel would not provide during meet and confer discussions on email production which continued a discussion with the Court that informs the scope of the email production called for (Exhibit A-38 to A-42):

MS. DeJUNEAS: Your Honor, would the Court entertain inquiring whether all of the Internal Affairs investigations were concluded by November of 2020? Because if not, I mean, those are squarely within, you know, the confines of our complaint and our discovery requests.

THE COURT: You have --

MR. SULTAN: And, Your Honor, they have two clients, two plaintiffs. If we're going to drag this out into thousands of other inmates or even three other inmates --

THE COURT: No. With respect to those two -- well, I don't know. Where does the IAD investigation fit in?

MS. DeJUNEAS: Well, we're alleging a cover-up, a race-based conspiracy that involves beating dozens of –

THE COURT: You can allege everything, but alleging doesn't open up everybody's files, right? So I am trying to focus to make sure that we get -- you get what you need, and then, you know, obviously, if you have the smoking gun, you come back into court. You say I have the smoking gun, we need to reopen. My guess is that emails are not your source of major information here, but they always help. They always help.

MS. DeJUNEAS: We have found some very helpful information there. But so --

THE COURT: But when does the IAD timeline fit in with discipline of these two plaintiffs?

MS. DeJUNEAS: I have no idea. I mean, we don't --

THE COURT: You have the IAD reports, right? You have the relevant IAD reports. So you actually do know what the timeline is. I don't. But you do. So tell me.

MS. DeJUNEAS: I'm not sure off the top of my head, but I'm also not sure whether the last Internal Affairs report is the end of the Internal Affairs investigation. I don't know if there are any steps beyond that, if there were meetings, if, you know, the outcome was discussed in some way. But we're alleging that they targeted black and brown inmates, and if I can't show that -- the result of the Internal Affairs investigation as to those inmates, then, you know, we're going to be hard-pressed to prove our claim.

THE COURT: All right. But there are lots of different documents, categories of documents, right? Your IAD investigation is not an email investigation. That's not the same thing, right? They're producing to you, I hope, what you've asked for, the IAD investigation of I guess all the named defendants? Is that your category? I don't know.

MS. DeJUNEAS: No, Your Honor, these are Internal Affairs investigations, that are allegations by inmates that they were beaten by staff or that staff engaged in other misconduct. So this is not the BOP staff.

THE COURT: Okay. So --

MS. DeJUNEAS: The starting point for these are grievances by inmates complaining that they had been assaulted.

THE COURT: All right. And you've done that – and you've asked for the IAD reports, right?

MS. DeJUNEAS: Yes.

THE COURT: And you have them?

MS. DeJUNEAS: I believe so. I mean, I haven't checked, you know, every single name off the list, but perhaps I should do that.

THE COURT: **And what you said is that because of this investigation -- because of this behavior, because of the hostility to black and brown inmates**, the events happened with the two plaintiffs in 2020, right? And that's your theory? I mean, you have to have this conspiracy before these events, right?

MS. DeJUNEAS: Right, right, right. **The conspiracy began in January 2020, probably around January 10th I think is the easiest date**. It might not have been that exact date. And we only want emails about things that happened in January. Our original request included through April. We're willing to limit it to January 10th through the 31st in terms of subject matter. But there are emails, for example, from people in Internal Affairs where they're talking about all of the investigations with -- you know, the status of all of

the investigations, but they're not being dealt piecemeal, like case by case by Internal Affairs. They're being dealt with as a body of investigation that all relate to allegations that --

                \*        \*        \*

MR. SULTAN: Your Honor, they've been provided with thousands of pages relating to these other inmates, dozens and dozens of other inmates, so they have all that information. But as far as searching for emails for adding more names to this, it's not relevant. They can talk about a conspiracy all they want, but as you said, they're not going to find that in an email. There is no conspiracy. And by their argument, we could keep going for all of eternity looking for emails that help them, and we're limited in what we can produce, logistically and otherwise, and we have to look to proportionality. We've given them 30,000 pages. And to extend the email search beyond November 9th is just excessive.

THE COURT: So it seems to me that November 9th, regardless **-- through November 9th gives you the emails at the relevant time to either discuss or not discuss this conspiracy that would affect these named plaintiffs**. You also have the IAD reports that fit in there somewhere. I think that's -- that gives you enough for now. So let's do the emails through November 9th. January 10th through November 9th, 2020, all right, of all the named -- the remaining defendants plus Mr. Freitas.

MR. SULTAN: Yes.

THE COURT: All right.

(Emphasis added).

33.     The search term list referenced by Attorney Sultan during the hearing (quoted and

bolded above in paragraph 31) could only be the search terms that Defendants were using to

search all emails previously as they set out in their paralegal's affidavit filed with this Court at

Dkt. No. 100-1, which stated (on page 2), the search terms included:

    1. Silva-Prentice
    2. Paulino
    3. Disorder
    4. Riot
    5. SBCC
    6. Incident
    7. Special Ops ( and Special Operations)
    8. Injury
    9. Dog
    10. Bite

11. Force
12. Excessive
13. Taser
14. Extraction

A copy is attached here as **Exhibit G** for the Court's convenience and easier reference.

34.    At Plaintiffs' request, Defendants later added the terms "canine" and "K9" to the search, since that is their terminology when discussing dogs.

35.    No other agreement of limited search terms was reached at all.

36.    The proposal that we had made prior to filing our second motion to compel that included limited search terms (reflected in an email filed at Dkt. 108-2, ECF pp. 29-30 and attached as **Exhibit H** for the Court's convenience) was dependent upon Defendants' counsel advising us as to when the Internal Affairs investigations ended. After the investigations concluded, Plaintiffs were willing to limit the search terms to their individual names or W numbers, as well as the names and W numbers of the other prisoners who Paulino allegedly ordered to assault a correction officer. Defense counsel refused to provide the date that the investigations ended and so no agreement was reached. More specifically, we made the following proposal which Defendants rejected by failing to provide the critical date when the investigations ended:

> Email Searches - we propose narrowing the requests for production of emails as follows: For the time period between January 10, 2020 and the date on which all internal affairs investigations and all actions required under 103 DOC 560 and 103 DOC 559 were completed concerning the events at Souza in January 2020, we will limit the subject matter of our requests to include only those uses of force which occurred on and between January 10 and 31, 2020. Please note that we are currently unaware as to when the investigations and required actions were completed and thus must rely on you to provide a true and accurate end date for this search.

> For the time period after the date on which all internal affairs investigations and all actions required under 103 DOC 560 and 103 DOC 559 were completed to present, we will limit the subject matter of our requests to include only those emails which contain any of the following search terms:

Silva-Prentice
W112667
455339
Paulino
W103232
455292
457423
G[redacted]
W[redacted]
C[redacted]
W[redacted]
V[redacted]
W[redacted]
R[redacted]
W[redacted]

Despite the lack of agreement and this Court's clear order to produce emails through November 9, 2020, Attorney Colonese first represented to us that they had used an even more narrow set of search terms than those proposed by Plaintiffs and rejected by Defendants, as described in the paragraph immediately above. This narrowed set of search terms, Attorney Colonese claimed, satisfied this Court's Order to produce emails for the existing Defendants and Joe Freitas through November 9, 2020. (*See*, Exhibit F-5 to F-7).

37.    During the motion hearing, defense counsel clearly recognized that we never reached an agreement on terms prior to the hearing as Attorney Sultan cited their own counter proposal from the prior negotiations as an "offer" stating "we made what we think is a reasonable offer" to which Plaintiffs had not agreed. He went on to explain their proposal:

> We will search all current defendants' emails from January 10th through -- Mr. Silva-Prentice's disciplining proceeding ended on September 11th of 2020. Mr. Paulino's ended on October 9th, 2020. We will search emails of current defendants through those dates, including emails in which any four -- there were four specific nonplaintiff inmates that the plaintiffs requested. Any time they are mentioned in conjunction with Mr. Paulino or Mr. Silva-Prentice, that's what we'd offer and that's what we're working on right now. It's tens of thousands of emails, but we're working on that. And I think that's fair.

Exhibit A-33.

38.     We rejected this proposal during the hearing, just as we had rejected it during the failed negotiations that preceded the filing of our second motion to compel.  At the hearing, Attorney DeJuneas promptly advised the Court that Plaintiffs did not agree to the proposed cut-off date for this search and explained why:

> . . . And then with regard to the other three inmates, we're not willing to accept only those emails where they're all named together. I'll give you an example. There's one email from defendant Gray that talks about Mr. Paulino and the other three inmates, and the reference to Mr. Paulino is the dog bite guy.
>
> THE COURT: As what?
>
> References Mr. Paulino not by name. He calls him the dog bite guy. So that's an email that would not have been captured by that search because Mr. Paulino is not named, along with Mr. Silva-Prentice and the other three. Another thing is that Mr. Silva-Prentice has nothing to do with those other three. He just happens to be Mr. Paulino's cellmate, and in fact, two defendants have testified that they didn't even know he was in the cell. So I believe that, you know, any emails with those particular names should be produced and certainly not only those emails where all five are named in one email because I don't think that that exists.

Exhibit A-34 to A-35.

39.     After the exchanges cited above on email searches, Attorney Sultan changed course and then represented to the Court that they would search through November 2020, per the Court's order, "for the existing defendants, with those search terms, **many search terms which we've worked out with them**" and "We'll add Mr. Freitas to that, through November 9th, 2020. **And they're aware of the search terms because we discussed it with them. That includes "K-Nine" spelled out, K nine, dog, bites, everything.**"  Exhibit A-37 to A-38 (emphasis added). The search terms he described in this quote that were "worked out" by the parties and included "K-9" and the other terms recited by Attorney Sultan, are the original search terms used by Defendants for the earlier productions (listed in paragraph 33 above), albeit for the unilaterally shortened time frame of January 10, 2020 to April 30, 2020.

40.     Based on Attorney Sultan's representation as to the terms to be used in the searches for the expanded time period, coupled with the language in this Court's order, we expected that those same search terms would be applied to the May 2020 to November 2020 period.

41.     But Defendants did not use these search terms, did not confer with us as to which search terms would be used, and failed to comply with the Order on Plaintiffs' second motion to compel.

42.     As described above at paragraph 29, when we inquired about the search terms used to obtain the emails produced through November 2020, Attorney Colonese first responded in her  November 3rd email that Defendants had performed two searches to comply with the Court's Order, specifically:

- ("Silva-Prentice" or "W112667" or "455339" or "Paulino" or "W103232" or "455292" or "457423"); and

- ("Paulino" or "Silva-Prentice") AND ("G[redacted]" and "W[redacted]") or ("C[redacted]" and "W[redacted]") or ("V[redacted]" and "W[redacted]") or ("R[redacted]" and "W[redacted]").

Attorney Colonese did not specify which date range was used for these searches, i.e., she did not indicate whether they searched emails sent or received between January 10 and April 30, 2020, or whether they searched emails sent or received between May 1 and November 9, 2020.

43.     We replied that the above in no way complies with the Court's order or the discussion at the hearing (for example, these searches do not include "K-9" at all even though Attorney Sultan specifically represented they were searching with that term and "everything").

44.     After we directed Defendants' counsel to the hearing transcript, including statements and representations by Attorney Sultan, we advised Attorneys Colonese and Sultan that we would seek sanctions if they refused to use the appropriate set of search terms, which would then force us to file a third motion to compel. Only then did Attorney Colonese "correct" herself in an email, claiming that the defense had not used the search terms described in her November 3rd email. She gave no explanation for why or how she could incorrectly describe the searches performed the first time around, nor did she explain who had corrected her purported misstatement Instead, she  claimed as follows:

> I apologize for the confusion; I have been corrected since my email to you on Friday (11.3.23) regarding the search terms for the focused email production through November. We made an updated search terms request to EOTSS following the August 1, 2023 motion to compel hearing, which is the basis for our email production we provided to you on October 27, 2023 ("Misc Emails Jan-Nov. 2020"). This production contemplated the following search terms and custodians for the **Jan 10, 2020-Nov 9, 2020** date range:

> Search terms:

> ("Silva-Prentice" OR "Paulino") AND ("Disorder" OR "Riot" OR "SBCC" OR "Incident" OR "Special Ops" OR "Special Operations" OR "Injury" OR "Dog" OR "Bite" OR "Force" OR "Excessive" OR "Taser" OR "Extraction" OR "G[redacted]" OR "W[redacted]" OR "C[redacted]" OR "W[redacted]" OR "V[redacted]" OR "W[redacted]" OR "W[redacted]" OR "W103232" OR "455339" OR "457423" OR "K-9" OR "K9" OR "canine") (c:c) (date=2020-01-10..2020 11-09)

45.     Attorney Colonese did not say why Defendants conducted a search using these terms for the entire January 10 to April 30 time period nor did she explain why, if that date range had been searched, Defendants were refusing to turn over all responsive emails.

46.     Even if Defendants performed the search described by Attorney Colonese, they are still in violation of this Court's order, which makes no reference to limited search terms.

47.     Further, Plaintiffs were quite clear at the hearing that they did not agree that such a narrow set of search terms would be appropriate. The search that Attorney Colonese claims

requires either "Silva-Prentice" or "Paulino" to be specifically referenced in an email to be produced. Plaintiffs never agreed to that and, in fact, that proposal was specifically rejected on the record by Attorney DeJuneas when she advised the Court that we would not agree to requiring our clients' names be in an email because we know that there are emails discussing them that do not reference their surnames or their names at all. (For example, Mr. Paulino was referred to in an email as "the dog bite guy" referencing the serious injuries he suffered when bitten by a DOC canine, an example Attorney DeJuneas provided at the hearing.) For this reason alone, the search the defense claim they performed is deficient.

48. We also do not understand why the defense was searching January through November, researching January through April instead of just searching May through November, the new extended time period ordered by the Court.

49. We requested that the defense provide their search term reports to us– the reports that show the data on what email custodians were searched with what search terms and how many hits resulted from the search – in an effort to finish discovery without more motion practice Such reports are regularly exchanged between litigants for e-discovery in my experience in civil litigation. Defense counsel refused to produce these reports in order to verify the search performed as well as other data (addressed later herein).

50. On November 13, defense counsel offered to do another search, but we explained why their newest proposal was still insufficient (Exhibit F-10):

…Unfortunately, the search you propose is still too restrictive. While it attempts to cover the concern about references to the "dog bite guy," it requires dog related terms to be tied to another term without explanation. Also, there is no connection between Silva- Prentice and C[redacted], G[redacted] or V[redacted], so tying his name to theirs/their W numbers has no logical connection to the facts of this case. Further, the email production has shown that there are emails relevant to what happened to our clients that do not reference their name, their W number, or the dog bite incident. …

51.     Attorney DeJuneas and I conferred in another effort to make a compromise proposal on email searches (made on November 22 at Exhibit F-4 to F-5), hoping to avoid bringing another discovery dispute to the Court.  The defense, however, rejected our proposal and would not make a proposal that addressed our concerns as repeatedly explained despite spending an entire month to try to resolve this issue (Exhibit F-1 to F2, response on defense on December 1, 2023).

52.     On December 1, 2023, Defendants made their final supplemental production which included two pdfs labeled as follows:

- "Jan 2020-Nov 2020 Focused" (21 pages)

- "Supplemental Jan-April 2020" (1,216 pages)

53.     Defense counsel's paralegal confirmed on December 4, 2023, that this was their complete supplemental production and nothing further would be produced.

54.     For over a year the Defendants had been working on completing production of emails for the time period from January 2020 to April 2020 (the time period they chose). After the Court ordered them to extend the time period through November 2020, they sought two additional months to comply. For this extended search adding seven additional months to be searched per the Court's order, they produced only 283 emails for the time period of May to November 2020 for 23 different custodians. (A total of 277 emails from May to November 2020 were produced in the pdf labeled "Misc Emails – Jan-Nov. 2020" and a total of 6 emails from May to November 2020 were produced in the "Jan 2020-Nov 2020 Focused" pdf.  (When I say refer to "emails" I mean a stand-alone email that is one document or an email chain that is one document.)  This number is in stark contrast to Attorney Sultan's representation that they were

working on a production of "tens of thousands of emails" through the fall of 2020 (see, Motion Hearing at Exhibit A-33).

### Redaction Disputes

55.     Additionally, we challenged certain redactions months ago, but Defendants still have not explained such redactions nor removed any of the challenged redactions. As cited above, Attorney Colonese stated "we don't have a redaction review deadline" failing to recognize that if the redactions are improper, then the redacted content is owed to us and should be produced before additional depositions so that we can question the witnesses with those documents in hand if necessary.

56.     Some examples of redactions that we challenged as they appear to us improper or at least suspicious are attached in **Exhibit K** which shows that seemingly random sentences are redacted that do not indicate they are discussing a prisoner (as only the prisoner's name would be redacted) and could not otherwise be privileged.

57.     Defendants have also not addressed that their prior productions were missing attachments to emails and were missing pages.

### Missing Custodians / "De-Duplication Explanation"

58.     We also believe that Defendants have failed to produce emails for all required custodians. Previously, defense counsel has produced batches of emails per custodian  labeling their pdf productions according to the defendant/custodian such as "Kenneway emails" and "Mici emails" etc. (see above, paragraph 20). There are certain custodians for which no email batches have been produced. When raised by us, Attorney Colonese stated that this is because all the emails go through a "deduplication" process. As we understand it, the defense contends that

if we did not get emails from a specific custodian that is because that custodian's emails were all duplicates of emails produced through another custodian. (see email explanation at Exhibit F-25)

59.     We have not received email batches for the following defendants/custodians; Thomas Turco, Christopher Fallon, James Allain, Jason Lanpher, Stuart McCulloch, Dennis Breslin, Robert D'Amadio, James Murphy, Mark O'Reilly, Evan Laranjo, and Jamie Marchand. According to defense counsel's explanation, to the extent responsive emails were located for these 11 parties, they were all duplicates of other custodians' emails.  Meaning the only responsive emails were emails that included two defendants in our case and that not one of the defendants sent an email that did not copy another defendant. For example, we did not receive an email batch specifically for Defendant Mark O'Reilly. Under defense counsel's explanation, O'Reilly's emails were searched but any hits in his emails are duplicates of emails produced through other defendant-custodians meaning if O'Reilly emailed about these events, every single responsive email must have copied one other defendant and he never emailed other DOC staff without copying one of the defendants in our case. We think this is very unlikely for all 11 of these defendants, if not impossible.

60.     We asked defense counsel to provide the search term and deduplication reports that would show the data on duplicates for each custodian from their searches to confirm this information. If we are wrong about duplicates, this data would have cleared things up in Defendants' favor. Defense counsel, however, refused to provide any reports, despite the ease with which they are obtained, and even though Defendants previously reported their searches have been "separated by custodian" (Dkt. No. 100-1, Affidavit of Morello-Quinn). If Defendants had conducted the searches as described in Attorney Colonese's emails, then the search and deduplication reports would show as much.

61.     It's also notable that seven of these custodians are the defendants whose depositions were already taken (Allain, Lanpher, McCulloch, Breslin, D'Amadio, Murphy, O'Reilly) as well as Mr. Turco for whom an order was obtained to prohibit his deposition. While not in a separate batch, it appears that the Defendants' most recent supplemental production incudes Fallon emails alone but the remaining custodians have not been produced.

62.     We also do not understand Attorney Colonese's deduplication explanation because the document productions we have reviewed have included numerous duplicate emails as well as numerous (and lengthy) duplicate attachments. See attached **Exhibit I** for just a few examples. We have observed many more.

**Text Messages / Personal Email Accounts**

63.     As stated above in paragraph 27(d) of this Declaration, after first objecting to produce any text messages of Defendants at all, defense counsel agreed to at least consider the most recently produced emails that some of the defendants were texting about matters involved with this case.  As shown in Exhibit E, we sent them an email from their production in which Defendant Turcotte and Defendant Breslin had been sending text messages about how to write incident reports regarding incidents at Souza during the lockdown in 2020. See, Exhibit E-4. We emailed defense counsel on November 1 as follows (Exhibit E-1):

> Text Messages. See attached email from Defendant Allain to Defendant Turcotte on February 14, 2020 stating "In regards to the text you sent everyone yesterday about the UOFs..." and the attached email from Defendant Breslin to Defendant Turcotte on February 18, 2020 discussing UOF report and stating "How about the one I sent you a text on yesterday?"  Please advise if you are standing by your objection to producing any text messages.  As we stated on the call, we know that DOC did a forensic analysis of Turcotte's phone so this data has already been pulled and should be easily accessible to you to obtain and produce.

64.     On November 8, 2023, Defendants responded: "We maintain our objections to producing text messages as stated in Exhibits 2 and 4 to Docket No. 112" which refers to the formal written responses to our document requests without any specification. (Exhibit F-25)

65.     On November 13, 2023, we sent to defense counsel another email indicating that at least one defendant (D'Amadio) used his personal email account for work for their consideration. See true copy of email and attachment at **Exhibit J**. Defense counsel responded that day: "We maintain our objections to producing content from personal email accounts as stated in Exhibits 2 and 4 to Docket No. 112." (Exhibit F-13) We have also now found in the recent production that Mark O'Reilly was using his personal email as well for DOC work as reflected on **Exhibit L**.

**Disciplinary Records**

66.     On disciplinary records, there are two different issues in dispute. One only involves Defendants Turcotte and Primack and one involves all Defendants.

67.     With respect to Turcotte and Primack, Judge Dein ordered (Exhibit B-2, at paragraph (e)):

> The defendants shall produce executive summaries from any IAD investigations of Raymond Turcotte and Charles Primack during the time period from 2016 to the present.

68.     On September 1, 2023, Defendants produced: (1) Executive summary for Turcotte investigation signed 3.31.23 by the Chief of the Professional Standards Unit; (2) Commissioner Mici's letter to Raymond Turcotte dated April 12, 2023; (3) Commissioner Mici's letter to Charles Primack dated April 24, 2023. A copy of Commissioner Mici's letter regarding Turcotte is attached as **Exhibit M**.

69.     On September 6, 2023, we emailed defense counsel stating that Commissioner Mici's letter to Raymond Turcotte referenced "the evidence presented at the hearing" (Letter, p.

2) as well as the "Hearing Officer's Report" (p. 4) concerning Turcotte. We asked for the

production of these referenced items.

70.    On November 13, 2023, defense counsel emailed:

Judge Dein ordered executive summaries from IAD investigations for Raymond Turcotte and Charles Primack; we provided that exact content in connection with DOC-MCI-CJ-16-259 and DOC-MCI-C-18-154 and therefore met this obligation pursuant to subsection (e) of her Order.

Exhibit F-14.

71.    On November 15, 2023, we advised:

We have not disputed that you met your obligation to produce executive summaries re Turcotte and Primack. We still seek the materials referenced in those summaries and were hopeful you would be reasonable in producing those instead of making us go back to the Court. But we will do so based on your position. We will pursue the other disciplinary record issues as well that we have not been able to resolve (along with the other items previously discussed and not resolved).

Exhibit F-11.

72.    The other disciplinary dispute concerns the Court's order (Exhibit B-2, at

paragraph (d)):

The defendants shall produce information from their disciplinary files that describes the substance of any alleged incidents involving prisoners directly, including any alleged failure to intervene in such incidents, that occurred within the 5 years prior to the incident at issue in the present litigation. The information shall include, but shall not be limited to, details regarding the defendant's alleged infraction(s) and any resulting discipline. To the extent it is available, the information shall also include any reports of disciplinary hearings before the IAD and the Commissioner, and any disciplinary decisions that were made by the Commissioner.

73.    On November 1, 2023, in our meet and confer email, we advised defense counsel

(Exhibit F-36):

You did not produce any additional disciplinary files in your supplemental production. We note that Judge Dein ordered production of any disciplinary files investigating any "alleged incidents involving prisoners" and not just files where discipline was actually imposed. Please advise if your position is that none exist or if you still need to supplement to comply with the Court's Order.

74.     On November 8, 2023, defense counsel responded on this issue (Exhibit F-27):

We did make a supplemental disclosure in furtherance of subsection (d) of Judge Dein's Order via email on 9.1.23, in which the following were provided:

1. Settlement agreement and release in connection with Grievance No. 450-15/OER #15-43154 – D'Amadio;
2. Commissioner Carol Higgins O'Brien's letter to Robert D'Amadio dated July 9, 2015;
3. Letter of reprimand from Superintendent Douglas DeMoura to Robert D'Amadio dated November 29, 2017;
4. Letter of reprimand from Director Charles Primack to Jamie Marchand dated June 29, 2020;
5. Letter from Commissioner Carol Mici to Mark O'Reilly dated August 17, 2020.

We disagree with your interpretation of subsection (d) of Judge Dein's Order in that we do not believe that it requires production of staff investigations for defendants not resulting in discipline.

75.     From review of the document production so far, Plaintiffs' counsel has learned as reflected in the Defendants' documents:

a.  of the 22 uses of force involving Taser-type weapons during the Souza shakedown in January 2020, Defendants and other members of the Hostage Rescue Team tased or drive-stunned 10 Black prisoners (45.5% of total uses of force with tasers), 9 Hispanic prisoners (41%), and only 3 White prisoners (14%). These numbers vary wildly from the racial makeup of DOC's male prisoner population:  41% White, 29% Black, and 27% Hispanic (as reported in Massachusetts Department of Corrections Annual Report 2020 publicly available);

b.  Defendants used their DOC emails to copy from or change other officers' reports;

c.  weeks after using or observing uses of force, Defendant Allain had to watch videos to recall when and where he used forced on prisoners;

d.  several Defendants knew that lower-ranking Defendants had not written reports about their uses of force on Silva-Prentice, Paulino and others until February 2020, weeks after DOC regulations require reports to be written;

e.  the disciplinary reports against Silva-Prentice and at least one prisoner linked to Paulino were ordered to be written just hours after Silva-Prentice testified in the *LaRocque* case in Suffolk Superior Court about what happened what occurred at Souza on January 22, 2020;

f.  high-ranking Defendants knew by early February 2020 that members of the Special Operations Team, including numerous Defendants, had failed to report approximately 70 uses of force that occurred in January 2020;

g.  Defendants Turcotte and Primack, as well as former defendant Freitas, had not completed their reviews of uses of force by Special Operations teams until June 30, 2023;

h.  Deputy Commissioner Thomas Preston was still reviewing use of force packets from the Souza January 2020 shakedown well into July, 2020; and

i.  former Defendant and former DOC Internal Affairs investigator Katie Appel, who ultimately absolved Defendants of responsibility for the assault and dog attack on Paulino wanted to further investigate key elements of what Defendants did to Paulino. Specifically, Appel wanted – but was not allowed by her superior – to expand her investigation of Paulino's allegations to include whether the alleged intelligence that Paulino ordered three other prisoners to assault unknown staff at an unknown future time justified Defendants' "no knock" entry into Plaintiffs' cell; why O'Reilly was permitted to use his K9 in a use force;" and why Defendants permitted Paulino to be marched down the unit and onto the recreation deck while he was virtually naked.

76.    Defendants claim that their searches of the January 10 – April 30 timeframe resulted in at least 112,075 individual emails that are responsive or "potentially responsive" to the terms Defendants used to search their accounts. See Exhibit G, email numbers reported by DOC paralegal. Defendants produced less than 25,000 pdf pages of emails. Those pages include attachments, many of which are duplicates of other attachments and some of which are quite voluminous. Thus, the actual production is a mere fraction of what the agreed search terms hit on in the email searches. We do not know who made the decision that tens of thousands of emails were not, in fact, responsive even though they contained the agreed set of search terms.

I declare under penalty of perjury under the laws of the United States of America and of the Commonwealth of Massachusetts that the foregoing is true and correct.

Executed this 12h day of December, 2023 in Boston, Massachusetts.

*/s/ Bridget A. Zerner*
Bridget A. Zerner (BBO No. 669468)
MARKHAM READ ZERNER LLC
11A Commercial Wharf West

Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax:(617)742-8604
bzerner@markhamreadzerner.com

## Certificate of Service

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 12, 2023.

*/s/ Patricia DeJuneas*
Patricia DeJuneas